1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   BIG LAGOON RANCHERIA, a Federally         No. 09-01471 CW
     Recognized Indian Tribe,
11                                             ORDER GRANTING
               Plaintiff,                      PLAINTIFF'S
12                                             MOTION FOR
         v.                                    SUMMARY JUDGMENT
13                                             AND DENYING
     STATE OF CALIFORNIA,                      DEFENDANT'S
14                                             CROSS-MOTION FOR
               Defendant.                      SUMMARY JUDGMENT
15   _____/         (Docket Nos. 80
                                               and 93)
16

17        Over the past several years, Plaintiff Big Lagoon Rancheria

18   (Big Lagoon or the Tribe) has sought to enter into a tribal-state

19   compact with Defendant State of California that permits it to

20   conduct class III gaming.  The Tribe alleges that the State has

21   negotiated in bad faith.  Big Lagoon moves for summary judgment and

22   an order directing the State to negotiate in good faith, under the

23   Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701, et seq.

24   The State opposes the motion and cross-moves for summary judgment.

25   The motions were heard on August 12, 2010.  Having considered oral

26   argument and the papers submitted by the parties, the Court GRANTS

27   Big Lagoon's motion and DENIES the State's cross-motion.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

BACKGROUND

2    I.   Legal Background

3        In enacting IGRA in 1988, Congress created a statutory

4    framework for the operation and regulation of gaming by Indian

5    tribes.  See 25 U.S.C. § 2702.  IGRA provides that Indian tribes

6    may conduct certain gaming activities only if authorized pursuant

7    to a valid compact between the tribe and the state in which the

8    gaming activities are located.  See id. § 2710(d)(1)(C).  If an

9    Indian tribe requests that a state negotiate over gaming activities

10   that are permitted within that state, the state is required to

11   negotiate in good faith toward the formation of a compact that

12   governs the proposed gaming activities.  See id. § 2710(d)(3)(A);

13   Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250,

14   1256-58 (9th Cir. 1994), amended on denial of reh'g by 99 F.3d 321

15   (9th Cir. 1996).  Tribes may bring suit in federal court against a

16   state that fails to negotiate in good faith, in order to compel

17   performance of that duty, see 25 U.S.C. § 2710(d)(7), but only if

18   the state consents to such suit.  See Seminole Tribe v. Florida,

19   517 U.S. 44 (1996).  The State of California has consented to such

20   suits.  See Cal. Gov't Code § 98005; Hotel Employees & Rest.

21   Employees Int'l Union v. Davis, 21 Cal. 4th 585, 615 (1999).

22       IGRA defines three classes of gaming on Indian lands, with a

23   different regulatory scheme for each class.  Class III gaming is

24   defined as "all forms of gaming that are not class I gaming or

25   class II gaming."  25 U.S.C. § 2703(8).  Class III gaming includes,

26   among other things, slot machines, casino games, banking card

27   games, dog racing and lotteries.  Class III gaming is lawful only

28                                    2

where it is (1) authorized by an appropriate tribal ordinance or resolution; (2) located in a state that permits such gaming for any purpose by any person, organization or entity; and (3) conducted pursuant to an appropriate tribal-state compact.  See id. § 2710(d)(1).

IGRA prescribes the process by which a state and an Indian tribe are to negotiate a gaming compact:

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.  Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

Id. § 2710(d)(3)(A).

IGRA provides that a gaming compact may include provisions relating to

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
>
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

United States District Court

For the Northern District of California

3

United States District Court
For the Northern District of California

(vii) any other subjects that are directly related to the operation of gaming activities.

Id. § 2710(d)(3)(C).

If a state fails to negotiate in good faith, the Indian tribe may, after the close of the 180-day period beginning on the date on which the Indian tribe asked the state to enter into negotiations, initiate a cause of action in a federal district court.  See id. § 2710(d)(7)(A)(i).  In such an action, the tribe must first show that no tribal-state compact has been entered into and that the state failed to respond in good faith to the tribe's request to negotiate.  See id. § 2710(d)(7)(B)(ii).  Assuming the tribe makes this prima facie showing, the burden then shifts to the state to prove that it did in fact negotiate in good faith.  See id.[1]  If the district court concludes that the state failed to negotiate in good faith, it "shall order the State and Indian Tribe to conclude such a compact within a 60-day period."  Id. § 2710(d)(7)(B)(iii).

---

[1] Specifically, IGRA provides:

(i)  An Indian tribe may initiate a cause of action [to compel the State to negotiate in good faith] only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).
(ii) In any action [by an Indian tribe to compel the State to negotiate in good faith], upon the introduction of evidence by an Indian tribe that—
(I)  a Tribal-State compact has not been entered into under paragraph (3), and
(II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,
the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.

25 U.S.C. § 2710(d)(7)(B).

4

United States District Court
For the Northern District of California

If no compact is entered into within the next sixty days, the Indian tribe and the state must then each submit to a court-appointed mediator a proposed compact that represents their last best offer.  See id. § 2710(d)(7)(B)(iv).  The mediator chooses the proposed compact that "best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of the court."  See id.  If, within the next sixty days, the state does not consent to the compact selected by the mediator, the mediator notifies the Secretary of the Interior, who then prescribes the procedures under which class III gaming may be conducted.  See id. § 2710(d)(7)(B)(vii).

II.  Prior Proceedings

     This is the second action concerning Big Lagoon's efforts to secure a tribal-state compact for class III gaming.  The first lawsuit, Big Lagoon Rancheria v. California (Big Lagoon I), Case No. 99-4995 CW (N.D. Cal.), related to the parties' earlier negotiations, which commenced after the Tribe's March, 1998 request to enter into a compact.  In Big Lagoon I, as here, the Tribe alleged that the State did not negotiate in good faith.

     Because the background of that case is explained in detail in the Court's March 18, 2002 Order on Big Lagoon's second motion for summary judgment, it will not be repeated here in its entirety.  The Court recounts, however, facts relevant to the Tribe's current action.

     On October 5, 2001, Big Lagoon filed a motion for summary judgment and sought an order compelling the State to negotiate in good faith.  The Tribe opposed the State's insistence that it enter

5

United States District Court
For the Northern District of California

into a "side letter agreement," under which the Tribe would not have commenced construction of a casino or conducted class III gaming until it had "completed all environmental reviews, assessments, or reports, and received approval for its construction by the State through its agencies."  Order of Mar. 18, 2002, at 8, Big Lagoon I.  The Court held that, under IGRA, the State "may not impose its environmental and land use regulations on the Tribe absent authority from Congress."  Id. at 12-13.  However, the State could negotiate for compliance with such regulations "to the degree to which they are 'directly related' to the Tribe's gaming activities or can be considered 'standards' for the operation of and maintenance of the Tribe's gaming facility under [25 U.S.C.] § 2710(d)(3)(C)(vi) and (vii)."  Id. at 15.  Concerning the side letter agreement, the Court stated,

> [T]he State's continued insistence that the Tribe agree to this broad side letter agreement would constitute bad faith.  The State may in good faith ask the Tribe to make particular concessions that it did not require of other tribes, due to Big Lagoon's proximity to the coastline or other environmental concerns unique to Big Lagoon.  The State could demonstrate the good faith of its bargaining position by offering the Tribe concessions in return for the Tribe's compliance with requests with which the other tribes were not asked to comply.  However, the State may not in good faith insist upon a blanket provision in a tribal-State compact with Big Lagoon which requires future compliance with all State environmental and land use laws, or provides the State with unilateral authority to grant or withhold its approval of the gaming facility after the Compact is signed, as it proposed in the side letter agreement.

Id. at 19.  The Court denied without prejudice the Tribe's motion for summary judgment, concluding that a determination of bad faith was premature "due to the novelty of the questions at issue regarding good faith bargaining under IGRA" and because the

United States District Court
For the Northern District of California

"Court's March 22, 2000 Order gave the State reason to believe that it could negotiate on environmental and land use issues." Id. The parties were ordered to resume negotiations consistent with the guidance provided in the Court's Order.

On April 2, 2003, frustrated by the pace of the negotiations, Big Lagoon filed another motion for summary judgment. The State had offered an alternative proposal, under which it would enter into a compact with the Tribe in exchange for, among other things, a requirement that the Tribe site its gaming facility on a twenty-five-acre parcel that it would purchase from the State. The Court was inclined to grant Big Lagoon's motion. However, in an order of June 11, 2003, the Court stayed its ruling and, instead, set a deadline by which the parties were to finalize a draft compact based on the State's new proposal. The parties failed to meet the deadline.

On August 4, 2003, the Court lifted the stay on its decision and denied Big Lagoon's motion without prejudice. Because the delay was attributable to demands made by the Tribe, not the State's intransigence, the Court directed the parties to continue negotiations.

Negotiations continued through 2005 and, in the intervening period, the governorship changed hands. On August 17, 2005, the Tribe and the Schwarzenegger administration entered into a settlement agreement, under which Big Lagoon would have been granted a tribal-State compact permitting the Tribe to operate, along with the Los Coyotes Band of Cahuilla and Cupeño Indians, a joint gaming operation in Barstow, California. Under this so-

7

United States District Court
For the Northern District of California

called "Barstow Compact," Big Lagoon agreed not to establish gaming facilities on its own lands.  The execution of the settlement agreement and the Barstow Compact, however, was contingent upon several conditions, one of which was ratification of the Barstow Compact by the California Legislature.

The Legislature did not ratify the Barstow Compact in either its 2006 or 2007 legislative sessions.  Accordingly, by its terms, the Barstow Compact became null and void in September, 2007.

III. Current Round of Negotiations

As contemplated by the settlement agreement, Big Lagoon and the State began a new round of negotiations.  On September 18, 2007, the Tribe sent a letter to the State, indicating its desire to conduct class III gaming "on the trust lands that constitute the Big Lagoon Rancheria contiguous to Big Lagoon along the coastline in Humboldt County."  Engstrom Decl., Ex. 2.

On November 19, 2007, the State sent a draft compact to the Tribe.  In an accompanying letter, the State expressed an interest in siting the Tribe's gaming facilities on off-reservation lands. The draft compact contained a section on "Revenue Contribution," requiring the Tribe to pay the State a portion of its annual net win.  Engstrom Decl., Ex. 3 at BL000684.  The draft compact also included a provision for "Exclusivity," which provided that, if the State were to "authorize any person or entity other than an Indian tribe with a federally approved Class III Gaming compact to operate Gaming Devices within" the Tribe's "core geographic market," and such person or entity were to so operate, the Tribe could, subject to restrictions, cease to make the payments required by the revenue

8

United States District Court
For the Northern District of California

contribution provision discussed above.  <u>Id.</u> at BL000688.  All subsequent compact proposals contained a requirement for revenue contribution and a provision for exclusivity.

On January 31, 2008, the State sent Big Lagoon another proposal, offering the Tribe a compact in exchange for, among other things, siting its gaming operations based on the State's preferences.  The State's preferred option was for the Tribe to construct its facilities at the "Highway Site," which was "located adjacent to the highway within five miles of the Big Lagoon Rancheria."  Engstrom Decl., Ex. 4 at BL000792.  Under the proposal, the Tribe would have been required to develop at the Highway Site, unless precluded from doing so.  In other words, the Tribe would have been able to develop on its lands only if, for some reason, it could not develop the Highway Site.  The State's preferred on-reservation alternative was the so-called "Five-Acre/Rancheria Site."  This plan would allow "a 250-device casino" on a nine-acre parcel comprising the Tribe's "original rancheria," "a 50-room casino-related hotel . . . on the Tribe's post-1988 trust lands" and various support facilities located on an adjacent five-acre parcel that the Tribe owned in fee.  <u>Id.</u> at BL000793.  In the event that the Tribe could not gain regulatory approval for use of the five-acre parcel, it could build on what the State called the "Rancheria Site."  This alternative would allow a "175-device casino on the 9 Acre Parcel and a 50-room hotel on the 11 Acre Parcel along with any other related facilities . . . ."  <u>Id.</u> at BL000794.  If the casino had been sited on either the Five-Acre/Rancheria or Rancheria sites, which were adjacent to

United States District Court

For the Northern District of California

environmentally-sensitive lands, the Tribe would have been required to comply with additional "Development Conditions." See id., App. A.

The January, 2008 proposal also provided that the Tribe would pay the State a share of its net win, ranging from twelve to twenty-five percent. The actual rate would depend on the Tribe's annual net win and the location of the casino. In exchange for the Tribe's payments, the State would provide "geographic exclusivity of 50 miles." Engstrom Decl., Ex. 4 at BL000794.

On March 21, 2008, through its counsel, Big Lagoon sent a letter to the State, which rejected any siting of its proposed gaming operations on locations "other than the Tribe's existing trust lands." Engstrom Decl., Ex. 6 at BL000904. The Tribe proposed that any compact should include a 350-device casino, a 120-room hotel and "all amenities (restaurants, spa, meeting rooms, etc.) associated with a modestly-sized, upscale facility." Id. The Tribe also suggested that any compact "should provide for . . . future expansion." Id.

On May 2, 2008, the State sent the Tribe a letter, which reiterated its desire to site any gaming operation on a location other than the Tribe's lands. The State emphasized its interest in "preserving and protecting, for present and future generations, environmentally significant State resources located adjacent to the rancheria." Engstrom Decl., Ex 7 at BL000907. The State then proposed a compact that would have permitted the Tribe to operate a 99-device casino on the nine-acre parcel within its original rancheria, and a 50-room hotel on the eleven-acre parcel on its

10

post-1988 trust lands.  The proposed compact also provided for geographic exclusivity of fifty miles and payments to the State, ranging from ten to twenty-five percent, depending on the Tribe's annual net win.

On October 6, 2008, Big Lagoon, through its counsel, sent a letter to the State, expressing its belief that the geographical exclusivity offered by the State was "meaningless" because its lands were "in an area in which non-Tribal gaming is unlikely to proliferate . . . ."  Engstrom Decl., Ex. 8 at BL000912.  And, although it had considered making payments to the State in earlier proposals, it stated that it was "no longer willing to pay the State what simply amounts to a tax . . . ."  Id. at BL000913.  Big Lagoon stated that any final compact would have to include the right to operate up to 350 gaming devices and a hotel with up to 100 rooms.  The Tribe also proposed that any payments it made would have to be deposited solely into the Revenue Sharing Trust Fund (RSTF).  The RSTF contains "moneys derived from gaming device license fees that are paid . . . pursuant to the terms of tribal-state gaming compacts for the purpose of making distributions to noncompact tribes."  Cal. Gov't Code § 12012.75; see also In re Gaming Related Cases (Coyote Valley II), 331 F.3d 1094, 1110 (9th Cir. 2003).  Big Lagoon stated that, if the parties did not execute a final agreement by November 7, 2008, it would resume its litigation in this Court.

On October 31, 2008, the State sent a letter to the Tribe, which contained its final proposal.  The State indicated that it was open to siting a 349-device casino on the Tribe's lands.

11

United States District Court
For the Northern District of California

However, because of such a facility's proximity to "a State ecological reserve, a State recreation area, and . . . [a] lagoon," the State proposed that the compact contain environmental mitigation measures. Engstrom Decl., Ex. 9 at BL000918.

The State also proposed that the Tribe make quarterly payments of fifteen percent of its net win; unlike the State's earlier offers, the Tribe's payments would have been based on a flat rate. The State explained that the fifteen-percent rate was consistent with what it received from other tribes. The State also responded that its request for "general fund revenue sharing" was in exchange for providing the Tribe with "the exclusive right to conduct gaming in the most populous state in the union." Id. at BL000916-17. According to the State, the Tribe would "receive significant value from a compact that provides it with a class III gaming monopoly" and that it was only fair for the State to receive "something of value in return." Id. at BL000916. The State also offered to permit the Tribe to continue receiving distributions from the RSTF, so long as Big Lagoon operated less than 349 devices and did not use RSTF funds to defray costs "arising out of, connected with, or relating to any gaming activities." Id.

The parties failed to execute a compact. On April 3, 2009, the Tribe filed its complaint, alleging that the State failed to negotiate in good faith, in violation of IGRA.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is

12

**United States District Court**
For the Northern District of California

clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);
<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir.
1987).

DISCUSSION

I.   State's Requests for General Fund Revenue Sharing

Big Lagoon asserts that the State's failure to negotiate in
good faith is evidenced by the State's requests for general fund
revenue sharing,[2] insistence that the Tribe comply with various
environmental and land use regulations and recommendations that the
Tribe site its gaming facility off of its tribal lands.

As noted above, in its last offer, the State proposed a
tribal-State compact that required the Tribe to pay, on a quarterly
basis, fifteen percent of its net win into the State's general
fund.  Throughout the negotiation process, the State insisted that
the Tribe share its revenue.  The Tribe claims this is <u>prima
facie</u> evidence of bad faith.

Under IGRA, "a state may, without acting in bad faith, request
revenue sharing <u>if</u> the revenue sharing provision is (a) for uses
'directly related to the operation of gaming activities' in
§ 2710(d)(3)(C)(vii), (b) consistent with the purposes of IGRA, and
(c) not 'imposed' because it is bargained for in exchange for a
'meaningful concession.'"  <u>Rincon Band of Luiseño Mission Indians</u>

---

[2] The proposed tribe-State compact does not identify the
State's general fund to be the beneficiary of the Tribe's payments.
However, throughout its papers, the State acknowledges that such
revenue contributions would be paid into the State's general fund.
<u>See, e.g.</u>, State's Am. Opp'n 6.

United States District Court
For the Northern District of California

v. Schwarzenegger, 602 F.3d 1019, 1033 (9th Cir. 2010) (citing Coyote Valley II, 331 F.3d at 1111-15) (emphasis in original).

Here, the State's demands for general fund revenue sharing constitute evidence of bad faith.  The State does not dispute that its requests were non-negotiable.  Indeed, throughout its communications to the Tribe and briefs on this motion, the State asserted its entitlement to seek revenue sharing as consideration for a gaming compact.  See, e.g., Engstrom Decl., Ex. 9 at BL000916.  Because the State's insistence on general fund revenue sharing amounts to a demand for direct taxation of Big Lagoon, the burden shifts to the State to prove that it nonetheless negotiated in good faith.  See Rincon, 602 F.3d at 1030; 25 U.S.C. § 2710(d)(7)(B)(ii).

The State makes no effort to do so.  It does not argue that the revenue sharing provision is directly related to the operation of gaming activities.  Nor does it contend that general fund revenue sharing is consistent with the purposes of IGRA.  Instead, the State argues that Rincon was wrongly decided and that, even if the decision stands,[3] it is not applicable to this case.

As the State acknowledges, the Court is bound to follow Rincon, see Wedbush, Noble, Cooke, Inc. v. SEC, 714 F.2d 923, 924 (9th Cir. 1983), and the State fails to demonstrate that Rincon's

---

    [3] In Rincon, the State petitioned the Ninth Circuit for a rehearing en banc, which was denied.  However, the Ninth Circuit stayed the issuance of its mandate pending the filing of the State's petition for a writ of certiorari with the United States Supreme Court.  The Supreme Court has not yet ruled on the State's petition and, accordingly, the Ninth Circuit's stay remains in effect.  Fed. R. App. P. 42(d)(2)(B).

14

United States District Court
For the Northern District of California

teachings are not applicable here.  In that case, the Rincon tribe desired to expand its gaming operations, which required it to renegotiate provisions of its 1999 compact with the State.  602 F.3d at 1024.  Similar to its negotiating position with Big Lagoon here, the State offered to allow the tribe to expand its gaming operations, "but only if Rincon would agree to pay the State 15% of the net win on the new devices, along with an additional 15% fee based on Rincon's total 2004 net revenue."  Id.  As here, the State offered the tribe an "'exclusivity provision.'"  Id.

Applying the IGRA burden-shifting framework described above, the Ninth Circuit held that the State did not rebut the tribe's prima facie showing that the demand for general fund revenue sharing evidenced a failure to negotiate in good faith.  In particular, the court concluded that contributions to the State's general fund were not, as required by IGRA, "directly related to the operation of gaming activities."  Id. at 1033 (citing 25 U.S.C. § 2710(d)(3)(C)(vii)).  The court also held that the State's demand was not consistent with the purposes of IGRA.  Rincon, 602 F.3d at 1035-36.  Finally, the Ninth Circuit held that the State did not offer a "meaningful concession" in exchange for its demand of revenue.  Id. at 1036.  The court explained that Proposition 1A, which amended the State's constitution to "authorize tribal gaming in California" and "effectively gave tribes a state constitutional monopoly over casino gaming in California," id. at 1023, rendered the State's offer of exclusivity meaningless.  The Ninth Circuit explained that

in the current legal landscape, "exclusivity" is not a

15

United States District Court

For the Northern District of California

new consideration the State can offer in negotiations
because the tribe already fully enjoys that right as a
matter of state constitutional law.  Moreover, the
benefits conferred by Proposition 1A have already been
used as consideration for the establishment of the RSTF
and SDF [Special Distribution Fund[4]] in the 1999
compact. . . .  The State asserts that it would be unfair
to permit Rincon to keep the benefit of exclusivity
conferred by Proposition 1A without holding the tribe to
an ongoing obligation to periodically acquiesce in some
new revenue sharing demand.  While we do not hold that no
future revenue sharing is permissible, it is clear that
the State cannot use exclusivity as new consideration for
new types of revenue sharing since it and the collective
tribes already struck a bargain in 1999, wherein the
tribes were exempted from the prohibition on gaming in
exchange for their contributions to the RSTF and SDF.

Id. at 1037 (citations omitted).

The State attempts to distinguish Rincon by arguing that,
unlike the tribe in that case, the Tribe here has not offered
anything for the rights granted under Proposition 1A.  The State
appears to assert that Proposition 1A exclusivity remains a

---

[4] The tribes' payments to the SDF may used by the State for
the following purposes:

(a) grants for programs designed to address gambling
addiction;

(b) grants for the support of state and local government
agencies impacted by tribal gaming;

(c) compensation for regulatory costs incurred by the
State Gaming Agency and the state Department of Justice
in connection with the implementation and administration
of the compact;

(d) payment of shortfalls that may occur in the RSTF; and

(e) "any other purposes specified by the legislature."

Coyote Valley II, 331 F.3d at 1106; see generally Cal. Gov't Code
§ 12012.85.  The Coyote Valley II court countenanced the State's
request for payments to the SDF because the State is restricted on
what it "can do with the money it receives from the tribes pursuant
to the SDF provision, and all of the purposes to which such money
can be put are directly related to tribal gaming."  Id. at 1114.

16

**United States District Court**
For the Northern District of California

meaningful concession as to Big Lagoon because the Tribe has not previously offered consideration for it. This argument is not persuasive. The State does not point to any provision of the California Constitution or indicator of legislative intent that suggests Big Lagoon is required to offer some form of consideration before exercising rights to which it is already entitled. Further, this argument addresses neither the relationship between general fund revenue sharing and gaming operations nor whether such revenue sharing is consistent with the purposes of IGRA; as explained above, both must be established to rebut a prima facie showing of a failure to negotiate in good faith.

The State correctly asserts that, under Rincon and Coyote Valley II, it may, in good faith, bargain for some form of revenue sharing. However, that it could have done so does not mean it actually did so here. As explained above, the State can establish that it negotiated in good faith, notwithstanding revenue sharing demands, if it satisfies the requirements set forth in Rincon. The State has not done so. Further, the Coyote Valley II court, which approved of revenue sharing payments by tribes, addressed payments into the RSTF and SDF, not into the general fund. Rincon rejected general fund contributions, which are at issue here.

The State offers two additional arguments to justify the propriety of its negotiating position, neither of which are persuasive. First, it maintains that it negotiated in good faith because its revenue sharing requests were consistent with the terms to which the Tribe agreed in the Barstow Compact. However, during the post-Barstow negotiations, the Tribe rejected general fund

17

United States District Court
For the Northern District of California

revenue sharing.  The State does not argue -- nor can it -- that it relied on the Tribe's prior position during the most recent round of negotiations.  In addition, as the State emphasizes elsewhere, its subjective beliefs are not relevant as to whether it negotiated in good faith.  See Rincon, 602 F.3d at 1041.

The State also argues it negotiated in good faith based on the United States Supreme Court's February, 2009 decision in Carcieri v. Salazar, 129 S. Ct. 1058 (2009).  There, the Supreme Court concluded that the Indian Relocation Act (IRA) authorizes the Secretary of the Interior to acquire land in trust for a tribe only if the tribe was "under the federal jurisdiction of the United States when the IRA was enacted in 1934."  129 S. Ct. at 1068.  The State maintains that Big Lagoon is not such a tribe and that, under Carcieri, the Tribe's eleven-acre parcel was unlawfully acquired by the Secretary of the Interior.  Thus, the State reasons, it negotiated in good faith because the public interest would be disserved by siting a gaming facility on land that was "unlawfully acquired in trust for Big Lagoon . . . ."  State's Am. Opp'n 13.

At the hearing on the motions, the State acknowledged the flaws in this argument.  The record of negotiations contains no evidence that the State bargained based on an argument that some of the Tribe's lands were unlawfully acquired.  Indeed, the State sent its last proposal to the Tribe in October, 2008, almost four months before the Supreme Court issued its decision in Carcieri.  The State cannot establish that it negotiated in good faith through a post hoc rationalization of its actions.  Cf. Arrington v. Daniels, 516 F.3d 1106, 1113 (9th Cir. 2008) (rejecting counsel's post hoc

18

explanations of agency action as a "substitute for the agency's own articulation of the basis for its decision"). At the very least, the State's after-the-fact challenge to the status of some of the Tribe's lands runs afoul of <u>Rincon</u>'s teaching that "good faith should be evaluated objectively based on the record of negotiations." 602 F.3d at 1041.

Furthermore, the State does not dispute that the Tribe is currently recognized by the federal government or that it has lands on which gaming activity could be conducted. On these facts, the Tribe is entitled to good faith negotiations with the State toward a gaming compact. 25 U.S.C. § 2710(d)(3)(A). That the status of the eleven-acre parcel may be in question does not change this result.

Finally, related to its public interest argument, the State maintains that the Court should deny the Tribe relief because it would be inequitable to require the State to negotiate for a compact involving lands that may have been unlawfully acquired in trust. However, the State offers no authority for the Court to act in equity in disregard of congressional intent. IGRA makes clear that, once a court finds that a state has failed to negotiate for a compact in good faith, "the court <u>shall</u> order the State and the Indian Tribe to conclude such a compact within a 60-day period." 25 U.S.C. § 2710(d)(7)(b)(iii) (emphasis added).

The State's newfound concerns need not go unaddressed. IGRA provides a procedure by which the Secretary of the Interior can disapprove of tribal-state compacts. <u>See</u> 25 U.S.C. § 2710(d)(8)(B). The Secretary could reject a compact between Big

19

**United States District Court**
For the Northern District of California

1    Lagoon and the State if he were to determine that it violated any

2    provision of IGRA, "any other provision of Federal law that does

3    not relate to jurisdiction over gaming on Indian lands" or "the

4    trust obligations of the United States to Indians." Id.

5        Because the status of the Tribe and its eleven-acre parcel has

6    no bearing on whether the State negotiated in good faith, the

7    State's request for a continuance pursuant to Federal Rule of Civil

8    Procedure 56(f) is denied.  In addition, the Court denies the

9    State's request to stay the proceedings in this case pending the

10   United States Supreme Court's decision on its petition for a writ

11   of certiorari in Rincon.  The State does not establish that a

12   discretionary stay is warranted.  See Lockyer v. Mirant Corp., 398

13   F.3d 1098, 1110 (9th Cir. 2005) (providing factors to be considered

14   in determining the propriety of a discretionary stay under Landis

15   v. N. Am. Co., 299 U.S. 248 (1936)).

16       Accordingly, the Tribe is entitled to summary judgment.  The

17   State's cross-motion for summary judgment is denied.

18   II.  State's Requests for Environmental Mitigation Measures

19       Big Lagoon maintains that, under IGRA, environmental

20   mitigation is not a permissible subject for the compacting process

21   and that the State's negotiating position amounted to an imposition

22   of such measures, evincing the State's lack of good faith.

23       The State's requests for compliance with environmental

24   mitigation measures are not new.  During the negotiations at issue

25   in Big Lagoon I, the State made similar requests, to which the

26   Tribe objected.  As it does here, the Tribe proffered statements by

27   members of Congress indicating there was no congressional intent

28                                    20

**United States District Court**
For the Northern District of California

that compacts include environmental and land use regulation.  <u>See</u>
Order of Mar. 18, 2002 at 15, <u>Big Lagoon I</u> (quoting statement of
Representative Tony Coelho, 134 Cong. Rec. H8155 (Sept. 26, 1988)).
The Court rejected the Tribe's argument that environmental and land
use issues were outside the scope of permissible topics under IGRA.
With regard to the legislators' comments, the Court stated that

> a better reading of the legislative history is that it
> warns against allowing States to regulate tribal activity
> broadly under the guise of negotiating provisions on
> subjects that directly relate to gaming activity and may
> be included in a tribal-State compact under
> § 2710(d)(3)(C).  In other words, the legislative history
> does not state that issues such as environmental
> protection and land use may <u>never</u> be included in a
> tribal-State compact, but only that the State may not use
> the compacting process as an excuse to regulate these
> areas more generally.

<u>Id.</u> at 16 n.5.

Big Lagoon now argues that <u>Rincon</u> requires reconsideration of
the Court's earlier conclusion.  Specifically, the Tribe points to
a footnote in <u>Rincon</u>, in which the Ninth Circuit cites Senator
Daniel Inouye's statement that Congress did not intend "that the
compacting methodology be used in such areas such as taxation,
water rights, environmental regulation, and land use . . . ."
<u>Rincon</u>, 602 F.3d at 1029 n.10 (quoting 134 Cong Rec. S12643-01, at
S12651 (Sept. 15, 1988)).  From this citation, the Tribe
extrapolates that "<u>Rincon</u> specifically holds" that Congress did not
intend that environmental regulation and land use be within the
scope of compact negotiations.  Big Lagoon's Reply 5.

The Ninth Circuit did not, by quoting a senator's statement in
a footnote, categorically forbid negotiations over environmental
mitigation measures.  It is true that the footnote to which the

United States District Court
For the Northern District of California

Tribe refers pertained to the Rincon court's discussion of permissible topics of negotiation under IGRA.  However, as stated above, comments like Senator Inouye's merely demonstrate that Congress did not intend states to use the compacting process as a tool for regulating tribes generally.  Thus, as the Court stated previously, the State's request for mitigation measures is permissible so long as such measures directly relate to gaming operations or can be considered standards for the operation and maintenance of the Tribe's gaming facility.  See 25 U.S.C. § 2710(d)(3)(C)(vi)-(vii).  The State must offer concessions in exchange for its request.  The Tribe does not dispute that its gaming activities would take place in an environmentally-sensitive area.  Nor does it contend that its proposed gaming operations would be carried on without any negative environmental impact, thereby obviating the need for environmental mitigation measures.

Coyote Valley II supports the Court's conclusion.  There, the court held that a labor relations provision was a permissible topic of negotiation and could be included in a gaming compact because it directly related to gaming operations.  331 F.3d at 1116.  The court noted that the State did not insist on "general employment practices on tribal lands," but sought a labor relations provision that pertained to "employees at tribal casinos and related facilities."  Id. (emphasis in original).

In the alternative, the Tribe appears to argue that no environmental mitigation measure directly relates to gaming activities.  It again cites Rincon, where the court rejected as circular "the State's argument that general fund revenue sharing is

22

United States District Court
For the Northern District of California

'directly related to the operation of gaming activities' because the money is paid out of the income from gaming activities . . . ." 602 F.3d at 1033.  The Ninth Circuit also cited 25 U.S.C. § 2710(d)(4), which limits the type of assessments for which a state may negotiate under IGRA.  <u>Rincon</u>, 602 F.3d at 1033.  Big Lagoon's reliance on these statements is misplaced.  The <u>Rincon</u> court focused primarily on the direct taxation of tribes, which is specifically identified and proscribed under IGRA.  <u>See</u> § 2710(d)(4) and (7)(B)(iii)(II).  IGRA does not treat environmental mitigation measures similarly.

Still relying on <u>Rincon</u>, the Tribe also contends that environmental protections are not consistent with the purposes of IGRA.  However, the <u>Rincon</u> court did not address environmental regulation.  Nor did it engage in a "potentially complicated statutory analysis" to determine the metes and bounds of IGRA's purposes because the State clearly misinterpreted <u>Coyote Valley II</u> and the congressional intent underlying IGRA.  602 F.3d at 1034.  The court stated that the "only <u>state</u> interests mentioned in § 2702 are protecting against organized crime and ensuring that gaming is conducted fairly and honestly."  <u>Id.</u> (emphasis in original).  It did not, however, declare that environmental mitigation measures, based on the location of a tribe's gaming facility, do not promote IGRA's purposes.  Compliance with such measures does not run counter to tribal interests.  <u>Cf.</u> S. Rep. 100-446, at 15 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 3071, 3085 (stating that, in considering good faith, the committee "trusts that courts will interpret any ambiguities on these issues in a manner that will be

**United States District Court**
For the Northern District of California

most favorable to tribal interests"). Thus, Big Lagoon does not establish that the State's proposed environmental mitigation measures are so discordant with IGRA's purposes that they amount to prohibited topics of negotiation.

This conclusion does not end the inquiry. As the Court has held, to negotiate for environmental mitigation measures in good faith, the State must offer a meaningful concession in exchange. See also Coyote Valley II, 331 F.3d at 1116-17 (explaining that the State's "numerous concessions" in exchange for a labor relations provision demonstrated that it did not act in bad faith). In its briefing, the State points to two: (1) the right to operate up to 349 gaming devices and (2) continued receipt of RSTF payments, even though Big Lagoon would no longer be a non-gaming tribe. However, the record of negotiations does not show that either of these offers was related to the proposed environmental mitigation measures; instead, they appear to have been offered in exchange for general fund revenue sharing. See Engstrom Decl., Ex. 9 at BL000915-17. Even if these purported concessions were connected to the request for environmental mitigation measures, the State does not satisfy its burden to show that they were meaningful. Without any context or comparison, the State simply declares that they were valuable. This is not sufficient.

Because the Court concludes that environmental mitigation measures are a permissible subject for negotiation under IGRA so long as they meet the definitions of § 2710(d)(3)(C)(vi) or (vii), the State could offer as a meaningful concession gaming rights that are more expansive than allowed to otherwise similarly situated

tribes.   The Rincon court noted, "In order to obtain additional time and gaming devices, Rincon may have to submit, for instance, to greater State regulation of its facilities or greater payments to defray the costs the State will incur in regulating a larger facility."  602 F.3d at 1039 (citing 25 U.S.C. § 2710(d)(3)(C)(i, iii)).

In sum, the State may request environmental mitigation measures so long as they (1) directly relate to gaming operations or can be considered standards for the operation and maintenance of the Tribe's gaming facility, (2) are consistent with the purposes of IGRA and (3) are bargained for in exchange for a meaningful concession.  Because it does not appear that the State offered a meaningful concession in connection with its requests for environmental mitigation measures, it thus far has failed to negotiate in good faith.  This further supports summary judgment in favor of Big Lagoon.

CONCLUSION

For the foregoing reasons, the Court GRANTS the Tribe's motion for summary judgment.  (Docket No. 80.)  The State's cross-motion for summary judgment is DENIED.  (Docket No. 93.)

Pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), the Court directs the Tribe and the State to conclude a compact within sixty days of the date of this Order.  If they fail to do so, thirty days after the expiration of the sixty-day period, Big Lagoon and the State shall each submit a proposed compact to the Court, along with a joint proposal for a mediator under 25 U.S.C. § 2710(d)(7)(B)(iv).  If the parties cannot agree on a mediator, they shall file separate

25

**United States District Court**
For the Northern District of California

1  proposals.

2      A further case management conference is set for March 8, 2011

3  at 2:00 p.m.

4      IT IS SO ORDERED.

5

6  Dated: 11/22/2010

7                                    CLAUDIA WILKEN
                                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26