FILED
SEP 27 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ORIGINAL

RECEIVED
SEP 27 2011
CLAUDIA WILKEN
U.S. DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIG LAGOON RANCHERIA, a Recognized Indian Tribe, <br><br> Plaintiff, <br><br> vs. <br><br> STATE OF CALIFORNIA, <br><br> Defendant. | No. 09-01471 CW <br><br> ORDER REGARDING MEDIATOR'S SELECTIONS OF APPROPRIATE COMPACT |

On November 22, 2010, the Court granted Plaintiff's motion for summary judgment to the effect that Defendant had failed to negotiate with the Plaintiff in good faith for a Tribal-State gaming compact pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.*

On May 4, 2011, the Court, pursuant to 25 U.S.C. § 2010(d)(7)(B)(iv), appointed the Honorable Eugene F. Lynch (Ret.) as Mediator.

Judge Wilkin described Judge Lynch's duties on page two of her Order as follows:

> "Big Lagoon and the State shall submit to him the proposed compacts they have lodged with the Court, as well as the Court's November 22, 2010 Order on the parties' motions for summary judgment and any other relevant prior orders of the Court. Judge Lynch 'shall select from the two proposed compacts the one which best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of' this Court. 25 U.S.C. § 2710(d)(7)(B)(iv). Judge Lynch may schedule briefing or oral argument as he sees fit. Once he decides, Judge Lynch shall submit to the State and the Tribe the compact he selected, *id.* § 2710(d)(7)(B)(v), and inform the Court of his selection."

The aforestated 25 U.S.C. § 2710(d)(7)(B)(iv) reads as follows:

> "(iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian Tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that

> represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this Act and any other applicable Federal law and with the findings and order of the court.
>
> (v) The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv)."

Thereafter, the parties disputed the proper role of the Mediator in this matter, which was resolved by Order of the Mediator on June 6, 2011, to the effect:

> "Accordingly, the Mediator finds that the proper procedure under IGRA, 25 U.S.C. § 2710(d)(7)(B)(iv) is not for the Mediator to hold any mediation sessions with the parties, but to select from the two proposed compacts the one which best comports with the terms of this Act and any other applicable Federal law and with the finding and Order of the District Court."

P. 15 of Order.

Subsequently, the matter was fully briefed by both sides and on August 24, 2011, both sides presented oral arguments at the JAMS San Francisco offices, and the matter was submitted for decision.

Although in the very thorough briefs submitted by the parties, there is a substantial reference made to the pre-compact negotiations of the State and Tribe, as the Mediator stated at oral argument that history has little relevance to the issue before the Mediator. The parties have now submitted their last and best offers, *i.e.*, the compacts, and it is the Mediator's job to choose between them based on the IGRA standard, which is set out by Judge Wilkin in her May 4, 2011 Order, and quoted verbatim on page one of this Order, namely, the compact that should be selected is the one that best comports with the terms of IGRA and any other applicable Federal Law and the findings and order of Judge Wilkin.

Accordingly, the Mediator will now review and discuss the findings and Order of Judge Wilkin, other applicable Federal Law, and the purpose and terms of IGRA.

### Judge Wilkin's Findings and Orders

Judge Wilkin's basic holding is set forth on page 25 of her Order dated November 22, 2010, that grants summary judgment to the Tribe to the effect that the State had not negotiated

in good faith:

> "In sum, the State may request environmental mitigation measures so long as they (1) directly relate to gaming operations or can be considered standards for the operation and maintenance of the Tribe's gaming facility, (2) are consistent with the purposes of IGRA and (3) are bargained for in exchange for a meaningful concession. Because it does not appear that the State offered a meaningful concession in connection with its requests for environmental mitigation measures, it thus far has failed to negotiate in good faith. This further supports summary judgment in favor of Big Lagoon."

In her March 18, 2002 Order (p. 12), Judge Wilkin clearly held that the State could not impose land use and environmental regulations on the Tribe but could bargain for them by offering meaningful concession.

> "A. Tribal Sovereignty and State Authority
> The State does not have authority to regulate Indian lands absent an express Congressional grant of jurisdiction. 'State laws generally are not applicable to tribal Indians on an Indian reservation except where congress has expressly provided that State laws shall apply.' McClanahan v. State Tax Comm'n of Az., 411 U.S. 164, 170-71 (1973). In Santa Rosa Band of Indians v. Kings County, the Ninth Circuit held that 'states may not regulate or tax Indian use of the reservation absent Federal consent.' 532 F.2d 655, 658 n.2 (9th Cir. 1975).[n.3] Therefore, the State may not impose its environmental and land use regulations on the Tribe absent authority from Congress."

*Also, at* p. 16:

> "n.5 The Tribe argues that this and similar portions of IGRA's legislative history indicate Congress' intent to prevent States from negotiating and including provisions on subjects such as environmental protection and land use as part of the compacting process. However, a better reading of the legislative history is that it warns against allowing States to regulate tribal activity broadly under the guise of negotiating provisions on the subjects that directly relate to gaming activity and may be included in a tribal State compact under § 2710(0(3)(C). In other words, the legislative history does not state that issues such as environmental protection and land use may <u>never</u> be included in a tribal-State compact, but only that the State may not use the compacting process as an excuse to regulate these areas more generally. The Committee recognizes that this may include issues of a very general nature and, [of] course, trusts that courts will interpret any ambiguities on these issues in a manner that will be most favorable to tribal interests consistent with the legal standard used by courts for over 150 years in deciding cases involving Indian tribes."

*And, at* p. 19:

> "The State may in good faith ask the Tribe to make particular concessions

3

> that it did not require of other tribes, due to big Lagoon's proximity to the coastline or other environmental concerns unique to Big Lagoon. The State could demonstrate the good faith of its bargaining position by offering the Tribe concessions in return for the Tribe's compliance with requests with which the other tribes were not asked to comply. However, the State may not in good faith insist upon a blanket provision in a tribal-State compact with Big Lagoon which requires future compliance with all State environmental and land use laws, or provides the State with unilateral authority to grant or withhold its approval of the gaming facility after the Compact is signed, as it proposed in the side letter agreement."

On the issue of whether land use and environmental issues are subjects that are directly related to gaming operations under § 2710(d)(3)(C)(VII) of IGRA, Judge Wilkin said "may be."[1]

Therefore, under Judge Wilkin's analysis since the State's compact is demanding substantial design and environmental mitigation measures, it must be thoroughly examined to see if the State of California is just using the compacting process as an excuse to regulate these areas more generally with an improper effort to require compliance with all State environmental and land use laws.

### Applicable Federal Law

A review of case law clearly indicates that Indian Tribes are sovereign over Indian lands subject only to the paramount powers of the United States and that states are generally precluded from exercising jurisdiction over Indians on their land unless Congress has clearly expressed an intent to permit it.

As the U.S. Supreme Court put it in *Rice v. Olson*, 324 U.S. 786, 789 (1945):

> "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history. See *Worcester v. Georgia*, 6 Pet. 55, 8 L.Ed. 483; 1 Stat. 469; 4 Stat. 729."

*California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987):

> "[1] the Court has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' *United States v.*

---

[1] That in the Mediator's opinion is an interesting question. I can clearly see that they are indirectly related but question how design and environmental impact issues are directly related to gaming. During oral argument, the State clearly appeared to concede that setting aside the issue of Class III gaming, the Tribe would have a right to build on tribal land a large hotel and restaurant, plus Class II gaming, without complying with any State design criteria or State environmental impact rules regarding its environmental impact on off-tribal lands. (*Also see* Attorney Engstrom's Declaration regarding this issue.)

> *Magurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 41 L.Ed.2d 706 (1975), and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,' *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). It is clear, however, that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided. Here, the State insists that congress has twice given its express consent: first in Pub.L. 280 in 1953, 67 Stat. 588, as amended, 18 U.S.C. § 1162, 28 U.S.C. § 1360 (1982 ed. and Supp. III), and second in the Organized Crime control Act in 1970, 84 Stat. 937, 18 U.S.C. § 1955. We disagree in both respects."

*Santa Rosa Band of Indians v. Kings Co.*, 532 F.2d 655, 658-659 (9th Cir. 1975):

> "[2][3] At the outset, we emphasize that this suit involves an attempt to regulate Indian use of Indian trust lands. We are clear, regardless of the modification worked in the exclusive Federal jurisdiction and tribal sovereignty doctrines of *Worcester v. Georgia*, 31 U.S. (6 Pet. 515) 350, 8 L.Ed. 483 (1832), by subsequent Court decisions such as *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) and *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), that in any event any concurrent jurisdiction the states might inherently have possessed to regulate Indian use of reservation lands has long ago been preempted by extensive Federal policy and legislation. *Warren Trading Post v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed2d 165 (1965); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 176, 176 n.15, 93 S.Ct.1257, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Williams v. Lee, supra*, 358 U.S. at 220-221, 79 S.Ct. 269. Congress, by the Indian Reorganization Act, authorized the government to purchase the lands involved here, and to hold the title in trust; it also authorized adoption of a trial constitution for the exercise of tribal self-government over the area. 25 U.S.C. § 476. Against the historical backdrop of tribal sovereignty (subject only to the paramount power of the United States) over reservation lands, we have little doubt that Congress assumed and intended that states had no power to regulate the Indian use or governance of the reservation provided, except as Congress chose to grant that power. *McClanahan, supra*, 411 U.S. at 175, 93 S.Ct. 1257. [FN2] Indeed, P.L. 280, by defining the limits of the jurisdiction granted 'P.L. 280 states' such as California, necessarily pre-empts and reserves to the Federal government or the tribe jurisdiction not so granted. *See McClanahan, supra*, at 172 n.8, 93 S.Ct. 1257. *Cf. Kennerly v. District Court*, 400 U.S. 423, 91 S.Ct. 4800, 27 L.Ed.2d 507 (1971)."

See also, *State of Washington, et al. v. U.S. – E.P.A.*, 752 F.2d 1465, 1469-1470 (9th Cir. 1985).

## IGRA

A good summary of the purpose of IGRA and the philosophy behind it is set forth in the

Ninth Circuit case of *Rincon Band, et al. v. Schwarzenegger, et al.*, 602 F.3d 1019, 1027 (9th Cir. 2010):

> "Nevertheless, promises and treaties were repeatedly broken or ignored as Indians were swept from their lands and homes by states, hoards of settlers, and sometimes even by the 'guardian' federal government itself, when they wanted the lands or resources possessed by those Indians. *See* Cohen's, *supra* at §§ 1.02-1.03. Recounting one such instance, the Supreme Court in *United States v. Sioux Nation of Indians* detailed the history of how, first by military force, then by Congressional act, the government deprived the Sioux tribe in South Dakota of much of its land because gold was discovered in the Black Hills. 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). Today, many tribes have struck figurative gold with casino gaming and, again, some state governments, just like their predecessors, are maneuvering to take, or at least share in, some of that figurative gold.
>
> Mindful of this ignominious legacy, Congress enacted IGRA to provide a legal framework within which tribes could engage in gaming – an enterprise that holds out the hope of providing tribes with the economic prosperity that has so long eluded their grasp - while setting boundaries to restrain aggression by powerful states. *See* S.Rep. No. 100-446, at 33 (1988) (statement of Sen. John McCain), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3101; 134 Cong. Rec. at S12654 (statement of Sen. Evans). In passing IGRA, Congress assured tribes that the statute would always be construed in their best interests. *See, e.g.*, S.Rep. No. 100-446, at 13-14, *as reprinted in* 1988 U.S.C.C.A.N. at 3083-84."

As to the purpose of IGRA, in the *Indian Gaming Related Cases v. the State of California*, 331 F.3d 1094, 1096 (9th Cir. 2003), the Ninth Circuit quoted with approval Judge Levi's statement in his case of *Artichoke Joe v. Norton*, 216 F.Supp.2d 1084, 1092 (2002):

> "After the Court's decision in *Cabazon*, States sought recourse on Capitol Hill. Congress passed IGRA the next year, in 1988. As Judge Levi has recently written: 'IGRA was Congress' compromise solution to the difficult questions involving Indian gaming. The Act was passed in order to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation."

25 U.S.C. § 2710(d)(3)(C) of IGRA limits the permissible subject of negotiation. *Rincon, supra*, 1028-1029, n.9:

> "25 U.S.C. § 2710(d)(4). IGRA limits permissible subjects of negotiation [FN9] in order to ensure that tribal-state compacts cover only those topics

that are related to gaming [FN10] and are consistent with IGRA's stated purposes."

And, IGRA is construed most favorable to tribal interests. *Rincon, supra*, 1029:

> "To help resolve the dispute, we, like the *Coyote Valley II* court, consider relevant the Congressional directive to construe ambiguities related to the issues covered by IGRA most favorably to tribal interests. *Coyote Valley II*, 331 F.3d at 1111 (quoting S.Rep. No. 100446, at 15, reprinted in 1988 U.S.C.C.A.N. at 3085)."

IGRA 2710(d)(3)(C) then states that a gaming compact may only include provisions relating to:

> "(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
> (v) remedies for breach of contract;
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
> (vii) any other subjects that are directly related to the operation of gaming activities."

In discussing the above factors, *Rincon, supra*, 1029, quoted with approval a remark by Senator Inouye:

> "*See also* 134 Cong. Rec. S12643-01, at S12651 (1988) ('There is no intent on the part of Congress that the compacting methodology be used in such areas such as taxation, water rights, environmental regulation, and land use . . . . The exigencies caused by the rapid growth of gaming in Indian country and the threat of corruption and infiltration by criminal elements in class III gaming warranted the utilization of existing State regulatory capabilities in this one *narrow* area.') (statement of Sen. Inouye) (emphasis added)."

Instructive in considering the purpose of IGRA is its Declaration of Policy contained in 25 U.S.C. § 2702(1) and (2):

> "Declaration of policy. The purpose of this chapter is – (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting economic development, self-sufficiency, and strong tribal governments; (2) to provide a statutory basis for the regulation of gaming by

7

an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players . . . ."

## **The Two Compacts**

Both the compacts are substantially similar with two substantial exceptions which are the heart of the dispute. The two exceptions are:

1) the State in their proposed compact has, among other things, a requirement that the Tribe agree to project design measures (11.2 & Exhibit C) comply with the Federal Coastal Zone Management Act (11.3) and Environmental mitigations measures (11.8.1) and an obligation to enter enforceable written agreements with a public agency(s) for no less than five years. In addition, the State's compact includes a provision that any dispute between the Tribe and the public agency regarding this contract be resolved by arbitration (13.0, et seq.). In short, a waiver by the Tribe of its right to seek redress in court.

2) The state has agreed in its compact that it would forego all monies that the Tribe would normally have to pay, or as set forth in its July 8, 2011 brief (p.1)"

> "The State's most important goal in this process is to ensure that Big Lagoon adheres to reasonable project design and environmental measures to protect its surrounding, while complying with IGRA's policy of promoting tribal economic development. In exchange, the State agrees to forgo compensation for all costs associated with the project, to which it is otherwise entitled under federal law, making the State's proposed compact the only compact in California that would require the tribe to pay absolutely nothing – under any circumstances – for regulatory assistance, revenue contributions to support non-gaming tribes, or to offset other direct impacts caused by its gaming operations."

In the Tribe's proposed compact, it agrees to pay into the Special Distribution Fund ("SDF") and the Revenue Sharing Trust Fund ("RSTF") (§§ 4.0 & 5.0).

In the Tribe's compact it also agrees to prepare a complete Tribal Environmental Impact Report (11.8.1) and give notice of the same to the county and public with an opportunity for comments. There is no binding obligation on the Tribe to comply with the TEIR. It also agrees to enter into good faith negotiations with a public agency to attempt to enter into a written

agreement with a public agency for the "timely mitigation of any significant effects on the off-reservation environment . . ." (11.8.7(a)(1)).

Based on the terms of its compact, the State argues that by foregoing having the State remit any monetary compensation that this constitutes a meaningful concession in exchange for the substantial environmental mitigation measures set forth in the State's compact terms.

The problem with this argument, as the Tribe correctly points out, is that that's a valid argument (assuming it is true) in the negotiating phase, but that phase is over and the test now is which compact best comports with the finding and order of the Court, the terms of IGRA, and applicable federal law. The Mediator does agree, however, that in apply the aforestated test to determine the best compact, the State's willingness to not impose any monetary obligations on the Tribe is something to be considered.

### The "Best Compact"

Although as stated above there are two disputed differences in the proposed compacts; the primary dispute (based on the parties' briefs and oral arguments) relates to the inclusion in the State compact of the off-reservation environment mitigation measures together with the design criteria.[2]

The Tribe's counsel refers to the environmental and design measures as "draconian," while that might be a bit of hyperbole there is no question but that a thorough review of these proposals indicate that they are extremely broad and substantial.

First of all, they include under 2.20 a definition of project which relates not only to the hotel, but access roads, parking lots, utility or waste disposal systems, and water supply.

They then include an obligation regarding the project to fully comply with the Federal Coastal Zone Management Act to the extent required by law. Under Section 11.8.1, the Tribe must prepare a Tribal Environmental Impact Report ("TEIR") which shows ways in which the significant effect on the environment might be minimized, including measures to limit unnecessary consumption of energy alternatives to the project, what mitigation would be

---

[2] In fact, on page 1 of its July 8, 2011 Brief (which is quoted on page 11), the State admits that this is its primary objective.

9

feasible, and would this reduce the effects of the project on the environment. The TEIR also has to discuss reasonable alternatives to the project or its location which would lessen environmental effects.

The TEIR is to be fully published so as to maximize public knowledge and comments regarding the same. This will include publication in public libraries, a newspaper of general circulation in the area, direct mailing to owners of land adjacent to the Tribe, and made available to the State Gaming Agency, the State clearinghouse, etc.

Also, the Tribe is required to enter into an enforceable written agreement with a public agency for no less than five years with respect to mitigation of significant effect on the off-reservation environment which is to include aesthetics, air quality, biological resources, traffic, noise, agricultural resources, etc.

In addition, the Tribe is required to enter into an enforceable agreement with the State Department of Transportation to provide for timely mitigation of traffic impact on highways and pay its fair share of the same.

As to the project design measures contained in Exhibit "C," they are, to put it mildly, numerous; occupying some six plus pages (C-1 – C-7) and include a temporary and permanent sediment basin, avoidance of grading during rainy season, a requirement of meeting or exceeding grading and soil compaction standards, a geologist's evaluation of soils for parking lot, roadway and foundation, a storm water pollution prevention plan, any soils disturbance remedied by planting natural vegetation, if raptors are mating as determined by a biologist, then a setback around nests, aesthetics relating to lighting, sign size limitation, the use of only certain materials and colors, an obligation to have the casino and infrastructure 80 percent screened from public view, no portion of a building more than three stories in height, noise abatement and limitations on construction to preserve air quality, etc.

It should be noted that this is not intended to be a complete list but only a sampling to show the breath of the State's environmental and design requirements.

The State's position as to why its compact is the better one appears to be based on the claim that the financial benefits to the Tribe by virtue of not having to pay for things it rightfully

10

should, at least offsets, if not exceeds, the broad environmental mitigation and design requirements that the State's compact call for the Tribe to do.

Neither side put on any definitive evidence as to the savings vis-à-vis the cost to the Tribe. There is no question that the Tribe would probably have to pay some monies into the Revenue Sharing Trust Fund and the Special Distribution Fund (Gov. Code sections 12012.6 and 12012.85), but there is no (as the State agrees) percentage or specific amount that has to be had in either of these two sections, and hence it is difficult to say exactly what the benefits to the Tribe would be by not having to contribute.

As to the environmental and design rules, the Mediator has handled these types of cases and has lived in California his entire life, and it is common knowledge that if you get in an environmental fight regarding building a project, two things happen – the cost of the project escalates dramatically and it takes years to get built, which delay also would result in a loss to the Tribe through gaming profits.[3]

In the Mediator's opinion, you cannot compare the savings to the Tribe versus the large financial risks of an environmental dispute, plus the delay in launching its gaming facility. It would appear clear that the financial risks of adopting the State's plan fall more dramatically on the side of the Tribe.

In any event, we must get back to the tests for what is the best compact. In light of the stringent, broad, and very substantial environmental and design requirements, it appears clear to the Mediator that the compact that best comports with the terms of IGRA, applicable federal law, and Judge Wilkin's Order is clearly the Tribe's.

What the State has tried to do here is violative of Judge Wilkin's Order of March 18, 2002 (p. 19), *i.e.*, "insisting upon a blanket provision in a tribal state compact with Big Lagoon which requires future compliance with all State environmental and land use laws." (This Order's pp. 4-5). Here, if the State hasn't required compliance with all such laws, it clearly has required compliance with most. In short, it would appear that the State is using the compacting process improperly, namely, as an excuse to regulate environmental and design areas more generally (*see*

---

[3] Interestingly enough, there is an article in the local legal newspaper that arrives at the same conclusion regarding the added expense and time lost in building the project (*Daily Journal*, September 14, 2011, p.1).

11

Judge Wilkin's 2002 Order, p. 16).

Furthermore, this is a project that is going to be erected on Indian tribal land and federal law has consistently held that Indian tribes retain attributes of sovereignty over both their members and their territory and that sovereignty is subordinate only to the federal government and not the states.

Also as set forth heretofore, the main purpose of IGRA is that by means of the business of gaming to provide the Tribe with the "economic prosperity that has so eluded their group." *See Rincon, supra.* It could not have been better said than by Judge Levi in *Artichoke Joe, supra*:

> "The Act was passed in order to provide 'a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments' and 'to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation.'"

*Also, Rincon, supra*, states regarding IGRA's purpose:

> ". . . to ensure that tribal-state compacts cover only those topics that are related to gaming (fn. 10) and are consistent with IGRA's stated purpose."

*Also see* the IGRA Declaration of Policy at page 10 of this Order. In short, IGRA's purpose is to promote economic prosperity for Indian tribes through profits from gaming, and it is not to promote state's environmental laws or design concepts.

IGRA, 2710(d)(3)(C) quoted in detail at page 9 of this Order states that a gaming compact may include only provisions relating to certain areas, and lists seven specific areas. None of these fit the environmental and design measures with the possible exception of #7, "any other subjects that are <u>directly</u> related to the operation of gaming facilities. (Emphasis added.)

Clearly, at least in the Mediator's opinion, detailed and rigorous design criteria and arbitration provisions have nothing to do <u>directly</u> with gaming. I seriously question whether off tribal land environmental measures have a direct relationship to gaming. Judge Wilkin isn't sure either – her answer was "maybe." But even if it is so construed, the Mediator's opinion as set forth herein would not change.

12

...

**Summary**

Of the two proposed compacts that have been lodged with the Court, the Mediator finds the one that best comports with the terms of IGRA, other applicable federal law, and the findings and Order of Judge Wilkin is the one proposed by the Tribe.

IT IS SO ORDERED.

DATED: September 23, 2011.

_____
The Honorable Eugene F. Lynch (Ret.)
Arbitrator

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Big Lagoon Rancheria vs. State of California, Northern District of California
Reference No. 1100066457

I, Seamus Tuohy, not a party to the within action, hereby declare that on September 23, 2011 I served the attached Order Regarding Mediator's Selection of Appropriate Compact on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco, CALIFORNIA, addressed as follows:

Peter J. Engstrom Esq.
Bruce H. Jackson Esq.
Ms. Irene V. Gutierrez
Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA   94111-3802
Phone: 415-576-3000
peter.engstrom@bakermckenzie.com
bjackson@bakernet.com
irene.gutierrez@bakermckenzie.com
    Parties Represented:
    Big Lagoon Rancheria
    Virgil Moorehead

Randall Pinal Esq.
Office of Attorney General of San Diego
110 W "A" St Ste 1100
San Diego, CA   92101
Phone: (619) 645-3075
Randy.Pinal@doj.ca.gov
    Parties Represented:
    Arnold Schwarzenegger
    Edmund Gerald Brown, Jr.
    State of California

Hon. Claudia Wilken
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, CA   94102
Phone: (415) 556-3167
Claudia_Wilken@cand.uscourts.gov
    Parties Represented:

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco, CALIFORNIA on September 23, 2011.

*[signature]*
Seamus Tuohy
stuohy@jamsadr.com